Western Union Telegraph Company v. D. B. Chambers.

Decided December 10, 1903.

**1.—Telegraphs—Mental Anguish—Charge—Damages.**
The trial court having charged the jury that if they found for the plaintiff "to allow him such a sum as they believed from the evidence would be fair compensation for the mental anguish, if any, suffered by him by reason of being unable to attend the funeral of his son," charged further that, "in this connection you are instructed that you can not allow plaintiff anything for the natural grief caused by the death of his said son, but can only allow him for the mental anguish caused by being prevented from attending his funeral." Held that the last quoted charge is not obnoxious to the objection that it assumes that plaintiff suffered mental anguish caused by being prevented from attending the funeral of his son.

**2.—Same—Evidence—Verdict.**
Under the evidence summarized in the opinion objection is not tenable that the verdict is unsupported by the evidence as not showing that the funeral in any event would have been postponed to the arrival of the plaintiff.

**3.—Same—Knowledge of Mistake.**
See the opinion for substance of evidence held to negative appellant's contention that plaintiff knew of the mistake in the telegraphic message upon receiving the same.

Appeal from the District Court of Bexar. Tried below before Hon. S. J. Brooks.

*Webb & Goeth,* for appellant.

*Thos. O. Murphy,* for appellee.

JAMES, Chief Justice.—D. B. Chambers brought this suit in the District Court of Bexar County to recover damages from appellant alleged to have been sustained by appellee by reason of the negligence of the telegraph company in the transmission of the following telegram addressed to him by his son, A. F. Chambers, sent from Des Moines, Iowa, on the 29th day of March, 1902, to wit: "Arthur died this noon; wire us if you can come." Arthur was plaintiff's son. The message as delivered to the appellee in San Antonio read, "Father died this noon; wire us if you can come." Prior to his death he had not been sick. A. F. Chambers was a married man, and had a father-in-law named Gunder, whom he generally referred to as "father" or "father Gunder."

Plaintiff alleged and testified that from the wording of the message as delivered to him he thought that his son's (A. F. Chambers') father-in-law had died, and he did not answer the telegram by wire, until he received the following message sent by the telegraph company on March 31st, at the request of A. F. Chambers at Des Moines, to wit:

"San Antonio, Texas.—Please request answer ours 29th. Chambers, No. 716 Cameron street. Same important. Des Moines, Ia., Mar. 30, 1902."

Upon receiving request for an answer about noon, March 31st, plaintiff says that he became suspicious that there might be a mistake in the message some way, and he was a little puzzled about it; that he wrote

the following telegram, "Can not come," on the back of the last message he received, as an answer to it, and sent it to the telegraph office by Mrs. Monette, his stepdaughter, and when he sent it to the office he told her to inquire if she could ascertain if there had been a mistake in any way in the transmission. "I was still under the impression and did not know at this time yet but what it was Gunder's death. When I sent that answer I did not knew it was my son." Plaintiff testified that if the telegram had read "Arthur" he would have replied at once, "I will come," and would have left at once, and that he would have arrived at Des Moines before the burial. That Mr. Gunder was only a passing friend, and he wondered why they were so anxious to hear from him, and that is what he told his stepdaughter in regard to what there is about having inquiry made as to whether there might be a mistake or not.

Stephen Dolan, a witness for the defendant, and its receiving clerk, testified that a lady came in about 1 o'clock on March 31st, bringing a telegram, and remarked that there was an error in the wording of one of the messages; that the word "father" she thought ought to have been "Arthur;" that she was almost sure it ought to have been "Arthur" instead of "father." Whereupon the San Antonio office sent the following message to Des Moines: "Des Moines, Iowa.—Please repeat quick the first word your 10 paid March 29th, Chambers signed same. Reads father our copy, rush answer. Dolan, S. A. 31." This was answered by the Des Moines office and the answer as received back at this office on said day, March 31st, and referred to plaintiff on April 2, as follows: "San Antonio, Texas.—Sys date first word our 29th Chambers sgd same if Arthur repeat Arthur. Des Moines, Ia., Mch. 31st. Respy referred to D. B. Chambers, 716 Cameron St. This refers to message you received Saturday. The first word should read Arthur instead of father. Western Union Tel. off. Dolan, San Antonio, March 31, '02." Arthur Chambers' remains were buried at Des Moines, April 1st, about 6 p. m., and appellee was not present at the funeral.

Appellant answered by general demurrer and general denial. The case was tried on the 16th day of March, 1903, before a jury, and resulted in a verdict in favor of plaintiff for the sum of $750.

The first assignment questions this clause of the charge, as assuming that plaintiff suffered mental anguish and was prevented from attending his son's funeral: "In this connection you are instructed that you can not allow plaintiff anything for the natural grief caused by the death of his said son, but can only allow him for the mental anguish caused by being prevented from attending his funeral." The clause was the close of a paragraph on the measure of damages, in which paragraph the jury had just been told, if they found for plaintiff "to allow him such a sum as they believed from the evidence would be fair compensation for the mental anguish, if any, suffered by him by reason of being unable to attend the funeral of his son." The jury could not observe this charge without having already acted upon the preceding instructions,

and found for plaintiff upon them. In those charges they were fully and properly instructed, and must, in order to have reached a verdict for plaintiff, have found both of these facts from the evidence.

The second is that the evidence is against the verdict, as it was an uncontradicted fact that Arthur Chambers had a wife, who had the control and disposition of his body, and no one else could have delayed the burial, and there is no evidence that his wife would have postponed it until plaintiff could have arrived; and the only evidence that the funeral would have been postponed was that of A. F. Chambers, who is not shown to have had any authority over the body or the funeral.

This assignment is clearly not sustainable. A. F. Chambers testified that "if we had received an answer on March 29th or 30th stating that plaintiff desired to attend the funeral we would have delayed it to give him time to get there." This witness also stated: "I received an' answer about noon on March 31st saying, "Can not come," and thinking for some reason he could not come, we went ahead with the funeral. If he had answered that he desired to attend the funeral and would start at once, the funeral would have been delayed until he reached here." It further appears that the body was in fact held until the 31st and buried then because of said reply. The testimony was amply sufficient to warrant the finding that the funeral would have been delayed. If it were essential, in law, to show that the wife would have consented to a postponement, such fact would be clearly indicated and the testimony referred to.

The third assignment is that the evidence shows beyond dispute that plaintiff knew of the mistake in the message.

Mrs. Monette was not a witness. Plaintiff's testimony does not warrant finding as a matter of law that he knew about the mistake from the start, nor that he knew it when he sent the telegram, "Can not come," on the 31st. He testifies that he did not know that the original telegram referred to "Arthur," and that he did not know it when he sent the telegram on the 31st, "Can not come." It is entirely consistent with all the testimony, that the telegraphic request for an answer he received from the telegraph company on the 31st, was the first suggestion he had that there was some mistake in the original one. He testified that when he wrote the answer "Can not come" and sent Mrs. Monette to defendant's office with it, he told her to ascertain if she could if there had been any mistake, and that he was then still under the impression that it was Gunder who had died, and did not know that it was his son. He did not learn the fact until the massage came to him on April 2, twenty-four hours after his son was buried. There was no testimony that Mrs. Monette knew any more than plaintiff did. What she said to Dolan indicated that she had apprehensions that it was "Arthur." The fact that the parties in Des Moines were desiring a reply by wire to the original telegram, under the circumstances, might have alarmed some dispositions more than others, and might have caused

Mrs. Monette to imagine the worst. Still all the testimony goes to show that she suspected or, to put it stronger, believed the telegram referred to Arthur. The evidence does not even show that plaintiff had such impression, but the contrary.

Whether or not Mrs. Monette's knowledge that the telegram meant "Arthur" could have been imputed to plaintiff we need not consider, because she had no knowledge of that fact.

*Affirmed.*

Writ of error refused.